GRATON & KNIGHT COMPANY, Appellant, vs. MAYVILLE SHOE CORPORATION, Respondent.

*March 13—May 1, 1945.*

12

14

For the appellant there was a brief by *Wheeler & Schell-pfeffer* of Mayville and *Lueck, Skupniewitz & Lueck* of Beaver Dam, and oral argument by *A. W. Lueck.*

For the respondent there was a brief by *Thiel & Allan* of Mayville and *Marvin L. Kohner* of Milwaukee, and oral argument by *Mr. Lloyd Allan, Mr. John A. Thiel,* and *Mr. Kohner.*

MARTIN, J.   Plaintiff owned and operated a tannery at Cudahy, Wisconsin.   Defendant owned and operated a shoe factory at Mayville, Wisconsin.   Joseph Brindis, its president and general manager, went to plaintiff's tannery on May 17, 1941, and there called on Mr. Scherer, general manager.   An agreement in writing was entered into, whereby plaintiff sold defendant two kinds of sole leather: Fifty thousand square feet of chrome retan bends, matched gold spot color; and seven thousand square feet of gold spot bends.   The seven thousand square feet of gold spot bends were a product made at plaintiff's Worcester, Massachusetts, tannery.   Other leather was included in the contract.   The only leather involved in the issues of this case is the fifty thousand square feet first mentioned.

At the time of sale the chrome retan sole leather was unfinished.   Before it could be used in the manufacture of shoes, it would have to be finished and put through a waterproofing process.   The proper color had to be applied, the leather sorted, and then embossed with gold spots.   Before the contract was signed, Mr. Brindis was taken to the place in the tannery where the unfinished leather was stored, and he inspected some of the bends.   To inspect all of the chrome retan leather called for in the contract would have taken approximately a week's time.

Reference has been made to the term "bends."   A bend is a piece of leather used for making soles for shoes.   It comes from the back part of the animal, and may be from several feet in width to six feet in length.

Mr. Scherer represented to Mr. Brindis at the time of sale that all the leather exhibited was good, sound leather.   The price paid by defendant was the prevailing market price for sound-quality leather.   At the time there was in the tannery a quantity of "reworked" leather.   It had been segregated from the other leather, and none of it was exhibited to Mr. Brindis.   It was brittle and cracky.   Leather which is brittle

and hard is leather which has been spoiled during the tanning process. It is caused by too much gelatine being taken out of the hide by chemicals used in tanning.

Mr. Grombacher, a tanner of many years' experience, called as an expert, testified that once this gelatine was destroyed there was nothing that could be done to make good leather out of it; that it could be reworked in order to make it saleable, but it would be soft and flabby and would have to be sold at a cheaper price because of its inferior quality; that it could not be sold as standard-quality merchandise. Irving Scherer, plaintiff's general manager, testified that "reworked" leather was of an inferior grade and quality. All the witnesses agree that at the time of sale none of the reworked leather was exhibited to Mr. Brindis.

Most of the leather was delivered to defendant during September and October of 1941. The last shipment was received at Mayville October 25, 1941. No tanning was done in plaintiff's tannery at Cudahy after March, 1941. At the time plaintiff took an inventory in June, 1941, approximately three hundred reworked leather bends were put with the bends examined by Brindis, and were set aside for shipment on defendant's contract. This leather was subsequently finished and shipped to Mayville. The contract described all of the sole leather purchased by defendant as "TR." These initials are an abbreviation of the term, "tannery run." This term is understood by the trade, through custom and usage, to designate "sound-quality leather" of the top three grades. The grades are determined by the number of surface blemishes on the finished leather. Mr. Scherer testified that reworked leather cannot be sold as tannery run. Mr. Grombacher testified that no reputable tanner would include reworked leather of substandard quality in the regular quality selection of leather.

The reworked bends were colored, finished, and embossed with gold spots in the same manner as the sound-quality

leather exhibited to Mr. Brindis at the time of sale. After the leather bends are put through the waterproofing process they become firm and stiff and it is impossible to determine their cracky condition by flexing or bending the leather. The defective quality of the leather is concealed and it is impossible to distinguish the reworked leather from the sound-quality merchandise.

The leather delivered to the defendant was made into shoes in the regular course of its business, and the shoes sold to its customers throughout the country. Knowledge of the defective condition of the sole leather was not brought to the attention of defendant until about the middle of October, 1941, when its customers returned shoes with cracked soles. Defendant received some complaints by letter about October 3, 1941. At that time Mr. Brindis telephoned to Mr. Hunter, salesman for plaintiff company, notifying him of the complaints. Mr. Hunter went to Mayville to examine the shoes the middle or latter part of October. He reported the matter to the home office of plaintiff company in the early part of November; also, sent them samples of cracked shoes and the letters of complaint from customers returning the shoes. Hunter assured Brindis an adjustment would be made; also, wired Brindis, stating that Nyberg, plaintiff's comptroller, would meet Brindis to adjust the matter.

Nyberg came to Milwaukee the early part of December, 1941, and met at the Pfister Hotel with Hunter and Brindis. Brindis took to that meeting a half-dozen pairs of shoes and some cut soles which were in a cracky condition. Brindis demanded damages for the loss his company would sustain. At the time he could not name a definite figure as to the amount of damages, as it was not possible at that time to determine the number of pairs of shoes that would be returned. Hunter testified:

"The purpose of the meeting was to arrange what was to be done with this cracky leather and cracky soles, and we told

Brindis we would go further into the matter, and that if the amount of the claim was established we would make the adjustment."

At the Pfister Hotel meeting the manner of disposing of returned shoes was agreed upon. Brindis offered to send all the returned shoes to plaintiff. Nyberg told Brindis to dispose of the shoes at the factory because his company had no facilities for disposing of damaged shoes. It was agreed that in the meantime the account would be kept open. In the forepart of January, 1942, Brindis met again with Nyberg and Bennett, from plaintiff's home office. This meeting was held in Cudahy. Brindis made an offer of settlement. Hunter subsequently offered to sell defendant a quantity of leather at a discount or lower price in order to settle defendant's claim for damages. Brindis refused the offer. The parties continued their negotiations until sometime in May, 1942. On April 13, 1942, Brindis deducted $7,500 from another and separate account owing the plaintiff, and attempted to close the matter in that way. The plaintiff returned the check, but renewed its promise to make a price concession after the account had been paid. In all, 27,279 pairs of gold spot shoes were returned to defendant by its customers. Of the fifty thousand square feet of chrome retan bends, plaintiff delivered to defendant 38,232½ square feet. By chrome retan is meant a certain tannage of sole leather. Gold spotting is an embossing put on the bends by machine.

Appellant argues that there is nothing in the record upon which fraud may be predicated. The jury found that the bends delivered to the defendant were not substantially of the same quality as those which Brindis inspected. The jury further found that plaintiff knew that they were not substantially of the same quality. On May 17, 1941, when Brindis was at plaintiff's tannery the bends he inspected were unfinished, and it is admitted that at that time the reworked bends, approximately three hundred, had been segregated and put in

a separate pile.    These were not shown to Mr. Brindis; but they were later put with the lot for shipment on defendant's order, and were delivered to the defendant.

In its brief appellant makes this statement:

"There is no claim here of fraud in the inducing of the contract, and we respectfully contend that even if facts are established showing that the seller deliberately and with intent to deceive and defraud substitutes another article, or an inferior article, that this constitutes a breach of the contract, and is not fraud."

We think the law applicable is to the contrary.    The defendant's counterclaims are based on both breach of warranty and fraud.    Of course, there is no claim of fraud in the inducing of the contract.    The fraud here, as found by the jury, occurred subsequently.

In the Restatement, 3 Torts, p. 117, sec. 551, liability for nondisclosure, it is stated:

"(1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter. . . .

"(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated

"(a) . . .

"(b) any subsequently acquired information which he recognizes as making untrue or misleading a previous representation which when made was true or believed to be so. . . ."    See comment on clause (b).

"By the weight of authority, however, it is generally held that the intentional nondisclosure of a latent defect by the seller, when he knows that it is unknown to the buyer, and is not discoverable by ordinary vigilance or observation, is fraudulent, even though there is no warranty, or he has refused to give one, and this rule is especially applicable where

the buyer has made inquiry, or where the seller knows that the buyer intends to use the articles or goods for some purpose for which on account of their defects they are unfit. . . ." 55 C. J., Sales, p. 135, sec. 98.

In *Dowling v. Lawrence,* 58 Wis. 282, 285, 16 N. W. 552, the court quoted approvingly from Chitty, Contracts, 753, as follows:

"Whenever one person misrepresents or conceals a material fact—that is, a fact which is substantially the consideration for the contract, and which is peculiarly within his own knowledge—such transaction will be void on the ground of fraud."

In 46 Am. Jur., Sales, p. 282, sec. 94, it is said:

". . . The general rule is that when there exists in the property which is the subject of a sale latent defects not discoverable on a reasonable examination of the property, the seller, if he has knowledge thereof, is bound to disclose such latent defects to the buyer, and his failure to do so may be made the basis of a charge of fraud."

We are of the opinion that the charge of fraud is adequately sustained by the evidence. Fraud being established, we need not consider the question of implied warranty.

Appellant contends that there is no evidence to sustain the findings on damages. This contention rests on the alleged inadmissibility of defendant's Exhibits 32 and 33. These exhibits, consisting of sixteen pages, are lists of shoes returned to defendant by its customers because of cracky soles, and contain names and addresses of customers, date when shoes were returned, number of pairs returned, and the amount of credit given by defendant to such customers.

Defendant has two sales departments: Smart-Style and Mayville Style. Exhibit 32 covered Smart-Style; and Exhibit 33, Mayville Style. These exhibits were prepared from the books and records at the instance of Brindis. He testified

that it was under his particular supervision, and that he inspected the shoes that were returned. Notations as to the number of returns were made by the shipping clerk. The shipping clerk employed by defendant when the first shoes were returned was not produced as a witness; he was in the army at the time of the trial. No other employee testified with respect to the entries on either exhibit.

Brindis testified that he knew of his own personal knowledge that the exhibits contained a statement of all the shoes returned by customers because of defective soles; that he knew what soles were on the shoes because only soles marked with gold spots were included; that while he directed the preparation of the exhibits from the books of account he also had personal knowledge of the record contained in the exhibits; that he knew all of the accounts and returned shoes; that he examined personally all return shipments of shoes on both exhibits; that in each shipment of returned shoes there was a slip which the merchant put in the case, requesting credit for the shoes returned; and that he personally okayed and approved every claim for damages made by the customers returning the shoes; that "I remember all returns. I had so darn much trouble with the soles that I watched them carefully;" that when he began to have trouble with the cracky soles he instructed the sales manager, superintendent, and shipping clerk to show him all the shoes that were returned.

It appears that at the commencement of the cross-examination of Brindis on the subject of Exhibits 32 and 33, counsel for defendant said:

"For the court's information, and for Mr. Lueck's information, we have available the original record from which these figures were taken, and you may have full access to them."

All original records of account were produced in court and tendered to plaintiff's counsel. It further appears that plaintiff's counsel made use of defendant's original books of ac-

count and in so doing had the assistance of one of defendant's bookkeepers.

Appellant contends that the proper foundation for the receipt of the exhibits was not established; that the books and records from which these exhibits were made, if offered in evidence upon the record as made, could not have been received because the provisions of sec. 327.25, Stats., were not complied with.

4 Wigmore, Evidence (3d ed.), p. 434, sec. 1230, states the rule as follows:

"Where a fact could be ascertained only by the inspection of a large number of documents made up of very numerous detailed statements—as, the net balance resulting from a year's vouchers of a treasurer or a year's account in a bank ledger—it is obvious that it would often be practically out of the question to apply the present principle by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result. Such a practice is well established to be proper.

"Most courts require, as a condition, that the mass thus summarily testified to shall, if the occasion seems to require it, be placed at hand in court, or at least be made accessible to the opposing party, in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available. . . . The most commonly recognized application of this principle is that by which the state of pecuniary accounts or other business transactions is allowed to be shown by a witness' schedule or summary. . . ." To same effect see 32 C. J. S. p. 714, sec. 789.

In *Jordan v. Estate of Warner*, 107 Wis. 539, 552, 83 N. W. 946, the court said:

"The ruling most relied upon as prejudicial error appears to be that which resulted in admitting the evidence of John Bottensek and some tabulated statements prepared by him,

showing the lands sold by Warner, the consideration received for each specific tract, as indicated by the records of deeds in the office of the register of deeds for Outagamie county, also showing the amount of tax claims acquired by Warner as to each tract of land, that information being gathered from the tax rolls for the years 1889 to 1894, inclusive.    All the records from which the tabulated statements were compiled were before the court.    The witness testified that he prepared the statements from a personal examination of the books and that he believed them to be true.    Appellant's counsel had ample opportunity to cross-examine the witness and to inspect the books, and thereby test the credibility of the evidence.    It can readily be seen that it was impracticable to produce and spread upon the record of the trial the history of each one of the large number of tracts of land to which the evidence referred. Respondents' counsel proceeded in that situation by a method well recognized as proper.    Instead of reading in evidence the material portions of the numerous books containing the multitude of items, he produced the books and then gave from the mouth of a witness who had personally examined them a summary of the material facts, and put in, as part of such witnesses' evidence, tabulated statements thereof. The statements were not received as original evidence but as part of the witness' evidence.    The rule which sustains that course is stated in Jones on Evidence at section 205, and is well supported by authorities. . . ."    To same effect see *Ruth v. State,* 140 Wis. 373, 378, 122 N. W. 733; *Riesen v. School District,* 192 Wis. 283, 289, 212 N. W. 783.

The exhibits were properly received as part of the testimony of Mr. Brindis.    *Bourda v. Jones,* 110 Wis. 52, 85 N. W. 671; *Nehrling v. Herold Co.* 112 Wis. 558, 568, 88 N. W. 614; *Hart v. Godkin,* 122 Wis. 646, 100 N. W. 1057. In *Dahl v. H. C. Crook Realty Co.* 208 Wis. 506, 511, 243 N. W. 426, the court said:

"The books in this case were merely used as memoranda and were not actually put in evidence.    The fact that memoranda used to refresh recollection or as the record of a past recollection happens to be contained in a party's book of ac-

count does not subject the testimony to the limitations of the account-book statute. The testimony in such cases is that of the witness, and the books are not offered in evidence as independent testimony."

Appellant cites the following cases: *Bazelon v. Lyon,* 128 Wis. 337, 107 N. W. 337; *F. Dohmen Co. (Limited) v. Niagara Fire Ins. Co.* 96 Wis. 38, 71 N. W. 69; and *Geuder, Paeschke & Frey Co. v. Milwaukee,* 147 Wis. 491, 133 N. W. 835. These cases are not in point. The *Bazelon Case* simply holds that in proving book entries the statute must be complied with where the issues are sought to be proved in that way. In the instant case defendant did not attempt to prove its case through the use of book entries. In the *F. Dohmen Co. Case,* a witness having no knowledge of the transaction and no knowledge of the correctness of the book entries attempted to testify as to what the books contained. In the *Geuder Case,* books of account were not involved, nor matter within the personal knowledge of the witness.

The findings of the jury are sustained by the evidence.

*By the Court.*—Judgment affirmed.